25CA1024 Peo in Interest of AC 02-12-2026

COLORADO COURT OF APPEALS

Court of Appeals No. 25CA1024
Mesa County District Court No. 23JV53
Honorable JenniLynn E. Lawrence, Judge

The People of the State of Colorado,

Appellee,

In the Interest of A.C., a Child,

and Concerning V.A.,

Appellant.

JUDGMENT AFFIRMED

Division VII
Opinion by JUDGE JOHNSON
Pawar and Gomez, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced February 12, 2026

Donald L. Steerman, County Attorney, Meeker, Colorado, for Appellee

Cassandra L. Coleman, Guardian Ad Litem

Robin Tieman, Office of Respondent Parents' Counsel, Boulder, Colorado, for Appellant

¶ 1    In this dependency or neglect proceeding, V.A. (mother) appeals the judgment terminating her legal relationship with A.C. (the child).  We affirm.

## I.    Background

¶ 2    After receiving referrals regarding the child's lack of supervision, hazardous living conditions, and mother's recent arrest, the Mesa County Department of Human Services (the Department) filed a petition in dependency or neglect alleging concerns of domestic violence, incarceration, neglect, mental health, and substance abuse.

¶ 3    The juvenile court subsequently adjudicated the child dependent or neglected and adopted a treatment plan for mother that, among other things, required her to (1) engage in timely communication with the Department; (2) attend family time; (3) complete a capacity to parent evaluation and follow the reasonable recommendations; (4) submit to random drug testing; (5) complete a domestic violence victim assessment and follow all reasonable recommendations; (6) maintain a safe and stable environment; (7) comply with all terms and conditions of any criminal cases and/or probation; and (8) attend family therapy as recommended.

¶ 4　　Fourteen months later, the Department moved to terminate mother's parental rights.  Following a two-day evidentiary hearing, the juvenile court granted the Department's motion and terminated mother's legal relationship with the child.

## II.　Due Process

¶ 5　　Mother contends that the juvenile court violated her due process rights at the termination hearing when it denied her request to appear by video and thus proscribed her presence to act as an advisory witness and allow her to testify.  She also claims the court erred by denying her counsel's request for a continuance after the court required her in-person attendance at the hearing.  Finally, mother contends that the court erred by disallowing the testimony of her rebuttal expert witness.  We discern no reversible error.

### A.　Standard of Review and Applicable Law

¶ 6　　We review procedural due process claims de novo.  *People in Interest of R.J.B.*, 2021 COA 4, ¶ 26.  We review the juvenile court's rulings on motions to continue for an abuse of discretion.  *People in Interest of E.B.*, 2022 CO 55, ¶ 14.  Likewise, we review a court's evidentiary rulings for an abuse of discretion.  *People in Interest of M.V.*, 2018 COA 163, ¶ 52, *overruled on other grounds by People in*

*Interest of E.A.M. v. D.R.M.*, 2022 CO 42. A court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair or when it misapplies or misconstrues the law. *E.B.*, ¶ 14.

¶ 7 Because "[p]arents have a constitutionally protected liberty interest in the care, custody, and management of their children," *People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 17, termination of the parent-child legal relationship must satisfy due process by providing "fundamentally fair procedures," *People in Interest of J.G.*, 2016 CO 39, ¶ 20 (quoting *Santosky v. Kramer*, 455 U.S. 745, 753-54 (1982)). "Under this principle, a parent must be provided with 'notice of the allegations in the termination motion, the opportunity to be heard, the opportunity to have counsel if indigent, and the opportunity to call witnesses and engage in cross examination.'" *E.B.*, ¶ 16 (quoting *A.M.*, ¶ 18). A parent may not obtain relief on a due process claim, however, absent a showing of harm or prejudice. *People in Interest of J.A.S.*, 160 P.3d 257, 262 (Colo. App. 2007).

### B. Additional Background

¶ 8 The juvenile court appointed counsel to represent mother at the initial shelter hearing. Eleven months later, mother's counsel moved to withdraw. During the withdrawal hearing, mother chose

to proceed without counsel. Consequently, the court granted counsel's withdrawal motion and appointed advisory counsel for mother. At the start of the termination hearing, based on mother's request, the court appointed mother's advisory counsel to serve as her counsel of record.

¶ 9 On the first day of the termination hearing, mother requested a continuance, citing an "acute illness." Mother provided a doctor's letter confirming her illness and estimating improvement within one week. The court then limited that day of the hearing to evidence regarding the Department's motion to terminate the child's father's legal rights, vacated the second day of the hearing, and ordered mother to attend the third day of the hearing scheduled four days later. Based on concerns that one day was insufficient to complete the presentation of evidence related to mother, the juvenile court set two additional hearing dates (day four and day five).

¶ 10 Mother appeared virtually for the third day of the hearing, which the court found "appropriate given her recent diagnosis." But the court also made clear that mother was only allowed to appear virtually because of her illness, reminded her that she had outstanding warrants, and instructed her to resolve them. The

court did not convene over the weekend. On the fourth day of the hearing, mother again appeared virtually. But because mother's illness had passed and she had no other reason to appear virtually, and considering mother's outstanding warrants, the court did not allow her virtual appearance.

¶ 11 Given the court's ruling, mother's counsel requested a continuance, citing the importance of having mother as an advisory witness. Considering the child and his need for permanency, the court denied the request. Mother did not appear in person during the termination hearing. The court checked periodically throughout the fourth day of the hearing to see if mother had turned herself in so she could be brought to court for the hearing, but mother had not done so.

¶ 12 Subsequently, mother's counsel attempted to call an expert witness — a psychologist who completed an evaluation of mother four years prior — but the Department objected based on relevance and lack of disclosure. Mother's counsel responded that advanced disclosure was not required because the witness was a rebuttal expert. Finding the witness to be a direct expert for mother, the

juvenile court precluded the witness's testimony because of nondisclosure under the civil rules.

## C.    Analysis

¶ 13    Mother argues that the juvenile court's orders precluding her virtual appearance, her testimony, and the testimony of her expert witness deprived her of a fundamentally fair proceeding, the meaningful opportunity to be heard and participate in her own defense, and her statutory right to call an expert of her choosing. We disagree.

### 1.    Virtual Appearance

¶ 14    We first reject mother's assertion that the order requiring her in-person appearance on the fourth day of the hearing violated her due process rights.

¶ 15    Mother asserts that she "did not have sufficient notice that her ability to participate in her termination hearing would be denied." Essentially, mother is asserting that she was unaware that she would be required to appear in person for the fourth day of the hearing. But the hearing notice, issued six weeks before the hearing and served on mother and her advisory counsel, directed the parties "to be and appear before [that] [c]ourt." On the third day

of the hearing, the court reminded mother that she was only allowed to appear virtually because of her illness. And when the hearing commenced on the fourth day, mother's counsel confirmed that she had advised mother that the court requested her in-person appearance that day.

¶ 16 Mother also asserts that the juvenile court "arbitrarily decided that it would prevent [her] virtual participation on the third day of the hearing and specifically during her presentation of evidence." But on the first and third days of the hearing, the court articulated that it expected mother to resolve her outstanding warrants. And mother's counsel confirmed that she advised mother about the court's instructions before the court denied mother's request to appear virtually on the fourth day of the hearing. Thus, mother's claim of undue surprise is belied by the record.

¶ 17 To the extent mother asserts that the court erred by disallowing her virtual appearance, she cites no authority in support of her implied assertion that a court must allow a party to participate virtually. Trial management decisions, such as whether to allow virtual appearances, are left to the juvenile court's broad

discretion. *See Makeen v. Hailey*, 2015 COA 181, ¶ 38; *People in Interest of M.W.*, 2022 COA 72, ¶ 17.

¶ 18    The juvenile court found that mother's decision to appear virtually on the fourth day of the hearing was an "ongoing manipulation of . . . the system and [the] [c]ourt." The record supports that finding. Mother did not provide any reason, other than her illness, why she was unable to appear in person. And by the estimations of mother's doctor, her symptoms should have been sufficiently improved by the fourth day of the hearing. The family time supervisor testified that, between the first and third days of the hearing, mother attended two in-person family time sessions after having been cleared by her doctor. Mother's only justification for why she did not appear in person for the fourth day of the hearing was a concern that, if arrested on her outstanding warrants, she would not be released in time to attend the hearing.

¶ 19    The court explained that if mother had turned herself in as ordered, it would have ensured that mother appeared in custody, as it had done with father, who was in custody but appeared in court despite serving prison time in Texas. And the court demonstrated its commitment to ensure mother's attendance at the termination

8

hearing in the event mother turned herself into law enforcement by checking periodically with the facility during the remainder of the termination hearing to determine whether mother was in custody and needed to be transported to court. But mother did not heed the court's order or otherwise endeavor to appear in person at court. *See* § 19-3-502(5.5)(a), C.R.S. 2025 (noting that a party to a dependency and neglect proceeding "has the . . . responsibility to attend and fully participate in all proceedings"). The court's action demonstrated that it was attempting to ensure mother complied with the law, while also allowing mother to appear at the termination hearing. Because the record supports the juvenile court's findings, and because its decision to disallow mother's virtual appearance was neither a misapplication of the law nor manifestly arbitrary, unreasonable, or unfair, we discern no abuse of discretion. *See E.B.*, ¶ 14.

¶ 20    Additionally, even assuming, without deciding, that the juvenile court's orders violated mother's due process rights, she has not shown that she was prejudiced as a result. *See id.* at ¶ 17 (providing that a parent must demonstrate actual prejudice to prevail on a due process claim).

¶ 21     While mother does not directly cite any prejudicial impact from the court's orders, she implies that the order disallowing her virtual appearance adversely impacted her case because her counsel was relying on mother's knowledge to examine and cross-examine witnesses and on mother's testimony to respond to the Department's allegations. But mother fails to explain what she would have testified about, how that testimony would have changed the outcome of the proceeding, or how her presence as an advisory witness would have altered the examination and cross-examination of witnesses. *See id.* at ¶ 22.

¶ 22     In sum, based on the record and lack of prejudice, we discern no violation of mother's due process rights.

## 2.     Continuance

¶ 23     To the extent mother asserts that the juvenile court abused its discretion by denying her request for a continuance following its order that mother could not appear at the hearing virtually, we disagree.

¶ 24     In denying mother's request, the court focused on the child's "extreme distress" at the ongoing lack of permanency and found that it was not in the child's best interest to continue the hearing.

*See* § 19-3-104, C.R.S. 2025 (requiring that, for cases regarding a child under six years of age when the petition was filed, a court must find that a child's best interest will be served before granting a continuance).

¶ 25    The record supports these findings.  During the first day of the hearing addressing mother's case, the expert who completed a parental capacity evaluation (PCE) testified that the child needed stability.  And the caseworker described the child's anxieties and opined that he needed stability and long-term permanency.  At the time of mother's requested continuance, the case had been open for almost two years, and the child had been out of the home for the same amount of time.

¶ 26    Because the juvenile court properly weighed the reason proffered for the continuance — mother's counsel's ability to present her case — against the need for prompt resolution of the proceeding and the child's best interests, we perceive no abuse of discretion.  *See People in Interest of T.E.M.*, 124 P.3d 905, 908 (Colo. App. 2005) ("In ruling on the motion [to continue], the trial court should balance the need for orderly and expeditious administration

11

of justice against the facts underlying the motion, while considering the child's need for permanency.").

### 3. Rebuttal Expert Witness

¶ 27 Finally, it is not entirely clear from the record that the court improperly classified mother's expert as a direct expert, but even if the court erred, the error is harmless.

¶ 28 The juvenile court found mother's proffered witness to be a defense witness, which required advanced disclosure pursuant to the terms of the court's pretrial order. And, considering the lack of timely expert disclosure, the court found that allowing the expert to testify would be too prejudicial to the other parties.

¶ 29 On the fourth day of the hearing, mother's counsel filed her witness disclosure, in which she listed the witness as an expert "in clinical psychology, custody evaluations, parental competency evaluations, and/or parent-child attachment" and stated that the witness was expected to testify regarding her observations and interactions with the parties and the children, evaluation of mother, and any other information she reasonably relied upon. It was not until the Department and guardian ad litem raised concerns about the lack of a disclosed expert report that mother's counsel indicated

her intention to call the witness for the purposes of rebuttal. Specifically, mother's counsel argued that the witness could "opine about who is qualified to administer psychological testing, who is qualified to interpret those things . . . , [and] what a correctly completed [parent-child interactional assessment] looks like." Thus, mother's counsel did not explain how, even if the witness was allowed to testify on these points, her testimony would "rebut a specific claim, theory, witness or other evidence" of the Department. *Warden v. Exempla, Inc.*, 2012 CO 74, ¶ 22 (quoting *People v. Welsh*, 80 P.3d 296, 304 (Colo. 2003)).

¶ 30    Even assuming mother's expert properly fell within the expansive category of a rebuttal expert based on *Warden*, mother has failed to establish any prejudice caused by the order disallowing testimony from the witness.  She asserts that "[c]alling an expert to rebut the [D]epartment's expert was crucial to her defense."  But she did not provide any offer of proof or other record indicating how her expert would have testified, so "we are unable to discern that the termination proceedings would have been affected

13

in any appreciable way" by the expert's testimony.  *E.B.*, ¶ 22 (citing *People in Interest of C.G.*, 885 P.2d 355, 358 (Colo. App. 1994)).[1]

### III.   Termination Criteria

¶ 31    Mother contends that the court improperly terminated her parental rights because the Department failed to comply with the Americans with Disabilities Act and, therefore, did not make reasonable efforts or adopt an appropriate treatment plan.  Mother also contends that the court erred by finding that she was unfit and unlikely to become fit within a reasonable period of time.

### A.   Standard of Review and Applicable Law

¶ 32    The question of whether a juvenile court properly terminated parental rights is a mixed question of fact and law.  *People in Interest of S.R.N.J-S.*, 2020 COA 12, ¶ 10.  Thus, we review the court's factual findings for clear error but review de novo its legal conclusions based on those findings.  *Id.*

---

[1] To the extent mother argues that she received ineffective assistance of counsel, we decline to address it because the argument is undeveloped.  *See People in Interest of D.B-J.*, 89 P.3d 530, 531 (Colo. App. 2004) (declining to address an appellate argument presented without supporting facts, specific argument, or supporting authorities).

14

¶ 33    The juvenile court may terminate parental rights if it finds, by clear and convincing evidence, that (1) the child was adjudicated dependent or neglected; (2) the parent has not complied with an appropriate, court-approved treatment plan or the plan has not been successful; (3) the parent is unfit; and (4) the parent's conduct or condition is unlikely to change in a reasonable time.  § 19-3-604(1)(c), C.R.S. 2025.

### B.    Americans with Disabilities Act (ADA)

¶ 34    Mother asserts that the juvenile court failed to consider her known disabilities by making reasonable accommodations and, therefore, erroneously concluded that her treatment plan was appropriate and the Department made reasonable efforts.  We disagree.

### 1.    Applicable Law

¶ 35    The ADA requires the juvenile court and the Department to account, and make reasonable accommodations, for a parent's disability when devising a treatment plan and providing rehabilitative services.  *People in Interest of S.K.*, 2019 COA 36, ¶ 34; *see also* 42 U.S.C. § 12102(1)(A) (defining "disability" under the ADA as "a physical or mental impairment that substantially

15

limits one or more major life activities"). But the ADA does not restrict the juvenile court's authority to terminate parental rights if a parent, even due to a disability, is not able to meet a child's needs. *People in Interest of C.Z.*, 2015 COA 87, ¶ 17. Rather, before terminating parental rights under section 19-3-604(1)(c), the ADA requires the juvenile court to consider whether reasonable accommodations were provided when determining the appropriateness of a parent's treatment plan and whether the department made reasonable efforts to rehabilitate the parent. *S.K.*, ¶ 34.

¶ 36 Whether a parent is a qualified individual with a disability under the ADA requires a case-by-case determination. *Id.* at ¶ 21. Before the Department can be required to provide reasonable accommodations under the ADA, the Department must be made aware that the person is a qualified individual with a disability. *Id.* at ¶ 22. Thus, while the Department must provide appropriate screening and assessments of a parent, the parent is responsible for disclosing information regarding her disability. *Id.* at ¶ 21. And a parent should also identify any modifications that she believes are necessary to accommodate the disability. *Id.*

¶ 37    In considering whether reasonable accommodations can be made for a parent's disability, the juvenile court's paramount concern must always be the child's health and safety. *Id.* at ¶ 36. Thus, what qualifies as a reasonable accommodation will vary from case to case based on the child's needs, the nature of the parent's disability, and the Department's available resources. *Id.* at ¶ 39.

### 2.    Analysis

¶ 38    We disagree with mother's assertion that the court erred by finding her treatment plan appropriate because it "contained no accommodations or modifications to ensure compliance with the ADA." At the dispositional hearing, mother informed the court that she was a qualified individual with a disability under the ADA because she had post-traumatic stress disorder (PTSD). As a result, mother requested three modifications to her treatment plan: a life skills worker, a trauma-informed caseworker, and an "advocate in the community." The court granted her first request and added a life skills worker to her treatment plan but denied her other requests because it found those to already be available to her. Mother did not move the court for additional changes or modifications to her treatment plan. And she does not explain how

17

her treatment plan could have been amended to address her disability and still render her a fit parent within a reasonable time. *See People in Interest of K.B.*, 2016 COA 21, ¶ 14 ("In determining whether a treatment plan is appropriate, the court must consider whether the plan's objectives adequately address the safety concerns identified during the assessment of the family."). Therefore, we conclude that mother has failed to establish that her treatment plan was inappropriate.

¶ 39    Mother also contends that the court erred by denying several of her requests for ADA accommodations. But her initial notice of ADA applicability and motion for ADA accommodations were filed while she was represented by counsel but lacked her counsel's signature. Consequently, the court reserved ruling until mother's counsel filed a signed copy of the pleadings. *See* C.R.C.P. 11(a) ("Every pleading of a party represented by an attorney *shall* be signed by at least one attorney of record in his individual name.") (emphasis added). But mother's counsel did not file any ADA notice or request for accommodations. And even if the court had accepted and considered mother's initial filings, her notice only stated that she had "profound psychological trauma and a diagnosis of PTSD

. . . [which] significantly impaired [her] ability to navigate legal proceedings and engage effectively in court hearings." *See* 29 C.F.R. § 1630.2(j)(1)(ii) (2025) (clarifying that "not every impairment will constitute a disability within the meaning of this section"); *see also Hughes v. Colo. Dep't of Corr.*, 594 F. Supp. 2d 1226, 1239-40 (D. Colo. 2009) (noting that "a plaintiff must ultimately prove either an actual or perceived substantial limitation in a major life activity to prevail on a claim under the ADA").

¶ 40    Indeed, it was not until the eve of the termination hearing that mother provided more detailed information that her disability — though still not specifically identified in the records she submitted — substantially limited a major life activity, that is, her ability to work. *See* 29 C.F.R. § 1630.2(i) (2025); *see also People in Interest of S.Z.S.*, 2022 COA 133, ¶ 16 ("For a parent to benefit from a reasonable accommodation, the parent must raise the issue of the ADA's applicability in a timely manner.").

¶ 41    But even assuming the updated disability disclosure mother filed before the termination hearing was considered timely submitted and, thus, the court erred by determining her claims of a disability were "conclusory," the court nevertheless considered the

specific accommodations she requested. *See Bly v. Story*, 241 P.3d 529, 535 (Colo. 2010) (holding that an error that did not substantially influence the outcome of the case or impair the basic fairness of the trial itself is harmless).

¶ 42 The court found mother's request for "flexible" family time to be unreasonable, expressing concern that it could cause anxiety for the child. *See S.K.*, ¶ 37 ("[T]he juvenile court's assessment of what constitutes a reasonable accommodation must take into account the child's best interests and need for permanency."). The court also found mother's request for flexible court hearing times to be unreasonable. Even so, the court gave mother breaks during hearings to work with the clerks to file her exhibits, confer with her advisory counsel, "get [her] thoughts gathered," and otherwise accommodate her disability.

¶ 43 The court found mother's other requested accommodations to be "unclear," routinely available regardless of any disability, or unrelated to her claim of disability. The record supports these findings. Many of mother's requested accommodations — including deadline extensions, fair hearings, impartial court personnel, treatment without bias or intimidation, opportunities to "contest

and strike any prejudicial fact alleged," and freedom to make complaints without retaliation — are available to all parties, regardless of any disability. And mother did not explain why her requests were necessary to accommodate her disability. For example, mother based her request for clearly articulated expectations from the Department on an alleged "lack of transparency" and a desire for "clarity and fairness," not on her disability. But the reasonable accommodations required under the ADA are limited to accommodations for a parent's disability. *See id.* at ¶ 34 ("[W]hen a parent involved in a dependency and neglect proceeding has a disability under the ADA, the Department and the juvenile court must account for and, if possible, make reasonable accommodations *for the parent's disability* when devising a treatment plan and providing rehabilitative services to the parent.") (emphasis added).

¶ 44    Finally, we reject mother's argument that the juvenile court erred by finding that the Department made reasonable efforts "without considering the implications of [her] disabilities and necessary accommodations for rehabilitation."

¶ 45    The court concluded that the Department's reasonable efforts were unable to rehabilitate mother. In support, the court found that the caseworker "went above and beyond what she was required to do to facilitate family time," mother "barely" engaged with the life skills worker, and, overall, mother's lack of engagement impeded her treatment plan progress.

¶ 46    Mother does not dispute these findings, instead arguing that the court's termination order erroneously focused on issues stemming from her PTSD — including the "chaotic" nature of family time, her communication style, and her "hyperfocus" on specific providers — for which no accommodations were provided. But mother does not explain which of her requested accommodations, if provided, would have resolved these issues. As discussed above, most of mother's requested accommodations, aside from flexible family time, focused on court procedures. And the Department provided mother with a caseworker experienced with domestic violence, a life skills worker, and referrals for family therapy, domestic violence group therapy, and parent coaching. But mother did not consistently engage with these provided services to work toward rehabilitation and reunification with the child.

22

¶ 47    In sum, the record shows that the juvenile court considered mother's disability claims and granted her reasonable requests for accommodation.  And the Department engaged in reasonable efforts and reasonably accommodated mother's disability.  But ultimately mother's lack of participation prevented her from successfully completing her treatment plan.  Thus, in relation to the ADA, we discern no error in the court's findings that mother's treatment plan was appropriate and that the Department made reasonable efforts to rehabilitate her and reunite her with the child.

### C.    Fitness

¶ 48    Mother asserts that the juvenile court erred by finding that she was unfit and unlikely to become fit within a reasonable period of time.  We disagree.

### 1.    Applicable Law

¶ 49    An unfit parent is one whose conduct or condition renders the parent unable or unwilling to give the child reasonable parental care.  *Id.* at ¶ 74.  Reasonable parental care requires, at a minimum, that the parent provide nurturing and safe parenting adequate to meet the child's physical, emotional, and mental needs and conditions.  *Id.*

¶ 50    A parent must have a reasonable amount of time to work on a treatment plan before the juvenile court terminates their parental rights. *People in Interest of D.Y.*, 176 P.3d 874, 876 (Colo. App. 2007). In determining whether a parent's conduct or condition is likely to change in a reasonable time, the court may consider whether any change occurred during the proceeding, the parent's social history, and the chronic or long-term nature of the parent's conduct or condition. *S.K.*, ¶ 75. Where a parent has made little to no progress on a treatment plan, the court need not give the parent additional time to comply. *S.Z.S.*, ¶ 24.

¶ 51    The determination of a reasonable period is fact-specific and varies from case to case. *D.Y.*, 176 P.3d at 876. However, a reasonable time is not an indefinite time, and it must be determined by considering the child's physical, mental, and emotional conditions and needs. *S.Z.S.*, ¶ 25. As in this case, when a child is under six years old at the time the petition is filed, the juvenile court must also consider the expedited planning provisions, which require that the child be placed in a permanent home as expeditiously as possible. *See* §§ 19-1-102(1.6), 19-1-123, 19-3-702(5)(c), C.R.S. 2025.

## 2.    Analysis

¶ 52    In finding mother unfit, the court considered evidence of her partial treatment plan compliance but ultimately determined that she could not become fit within a reasonable time based on her lack of progress during the case, long-standing history of instability, refusal to engage in services and make meaningful behavioral changes, and previous involvement with the Department.  The court also considered the child's physical, mental, and emotional conditions and needs and found that it would not be in his best interest to allow mother additional time to comply with her treatment plan.

¶ 53    The record supports these findings even though, as mother points out, she maintained communication with the Department, consistently attended family time, completed a capacity to parent evaluation and domestic violence assessment, engaged in individual therapy, submitted clean drug tests, and maintained housing.

¶ 54    The caseworker testified that, despite mother's partial treatment plan progress, mother exhibited the same problems addressed in the treatment plan without adequate improvement. *See* § 19-3-604(1)(c)(I)(B) (instructing that a court "shall not find" a

parent in reasonable compliance with their treatment plan when "[t]he parent exhibits the same problems addressed in the treatment plan without adequate improvement"); *see also People in Interest of D.L.C.*, 70 P.3d 584, 588 (Colo. App. 2003) (stating that, although absolute compliance is not required, "partial compliance, or even substantial compliance, may not result in a successful plan that renders the parent fit"). The case had opened due to concerns about mother's substance use and ability to provide for the child's basic needs. The PCE evaluator testified that, during her observations, mother ignored the child's needs and did not take accountability for her role in the case, admit any deficiencies in her parenting, or acknowledge any barriers to the child's return home. Similarly, during the caseworker's family time observations, she noted "multiple times" when mother "completely ignored" the child, including occasions when the child reported feeling hungry. Considering mother's regression in family time interactions, inconsistent drug testing, five pending criminal cases with outstanding warrants in each case that mother had not resolved, lack of therapeutic progress, inability to put the child's needs ahead of her own, and lack of overall engagement and behavioral change,

26

the caseworker opined that mother was unfit and unlikely to become fit within a reasonable period of time.

¶ 55 The caseworker also testified that the child had been in and out of foster care for more than one-third of his life and described him as a "very . . . anxious" child. She opined that he needed a stable, predictable, mindful caregiver and that long-term permanency for him was "overdue." *See S.Z.S.*, ¶ 25.

¶ 56 In short, the court's findings and conclusions are supported by the record. *See People in Interest of C.T.S.*, 140 P.3d 332, 334-35 (Colo. App. 2006). And we cannot reweigh the evidence or substitute our judgment for that of the juvenile court. *See S.Z.S.*, ¶ 29.

## IV. Alleged Judicial Bias

¶ 57 Mother contends that the juvenile court judge erred by not disqualifying herself because of actual bias. We are not persuaded.

### A. Standard of Review and Applicable Law

¶ 58 We review a claim for disqualification based on actual bias de novo. *People v. Jennings*, 2021 COA 112, ¶ 27.

¶ 59 In Colorado, the Code of Judicial Conduct requires disqualification of a judge when the judge's involvement with a case

27

might create the appearance of impropriety or when the judge has a personal bias concerning a party or counsel. C.J.C. 2.11(A); *see also People in Interest of A.G.*, 262 P.3d 646, 650-51 (Colo. 2011) (describing the two bases for disqualification as the "appearance of impropriety" and "actual bias").

¶ 60    To disqualify a judge for actual bias, a party must show that the judge has "a substantial bent of mind," *People in Interest of A.P.*, 2022 CO 24, ¶ 30 (citation omitted), that "in all probability will prevent [the judge] from dealing fairly with a party," *A.G.*, 262 P.3d at 650 (citation omitted). The United States Supreme Court has clarified that a judge's "remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." *Liteky v. United States*, 510 U.S. 540, 555 (1994); *see also A.P.*, ¶ 30 ("Bare assertions and speculative statements are insufficient to satisfy the burden of proof."). Adverse legal rulings are also unlikely to provide grounds for a bias claim. *See A.P.*, ¶ 30.

¶ 61    Because disqualification based on actual bias is designed to ensure that litigants receive a fair, impartial trial, they may not be waived. *A.G.*, 262 P.3d at 651. Thus, claims for disqualification

28

based on actual bias may be considered on appeal even when they were not raised in the district court. *See Jennings*, ¶ 21.

### B.    Analysis

¶ 62    The sole basis for mother's claim of disqualification is that, during a review hearing six months before the termination hearing, the judge commented that the county attorney's sister was "one of [her] best friends." Even if this relationship was sufficient to disqualify the judge based on an appearance of impropriety, mother never made such a request of the juvenile court. Therefore, on appeal, she is limited to seeking review for disqualification for actual bias. *See A.G.*, 262 P.3d at 651; *Jennings*, ¶ 21.

¶ 63    Based on our review of the hearing transcript, we do not discern, and mother does not identify, any "substantial bent of mind" preventing the juvenile court judge from dealing fairly with mother. *A.P.*, ¶ 30 (citation omitted). And a judge's connection to a counsel's family member, by itself, does not create actual bias. *See Schupper v. People*, 157 P.3d 516, 517 (Colo. 2007) ("[T]he mere existence of a trial court judge's friendship with a member of a prosecution team, by itself, does not create either actual bias or the appearance of impropriety.").

¶ 64    For these reasons, we reject mother's argument that the juvenile court judge was "required" to disqualify herself from the proceeding.

## V.    Conclusion

¶ 65    The judgment is affirmed.

JUDGE PAWAR and JUDGE GOMEZ concur.